UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Case Number 16-cr-20677
Honorable Thomas L. Ludington

D – 1 DAMARLIN MARKEEL BEAVERS,
D – 6 MICHAEL ALLEN PRATT, JR.,
D – 10 TERENCE JAEMAR JOHNSON,
D – 11 LAMAR TERRELL SIMON,
D – 15 CALVIN EARL MCREYNOLDS, JR.,

    Defendants.

_____/

**ORDER DENYING MOTION TO SUPPRESS AND DENYING MOTIONS TO SEVER**

On October 12, 2016, an indictment was returned which charged thirteen Defendants with participating in a large-scale conspiracy to possess and distribute controlled substances. ECF No. 16. On April 12, 2017, a first superseding indictment was returned which named five additional Defendants. ECF No. 183. In the first superseding indictment, the Government alleges that the eighteen individuals "knowingly conspired and agreed together . . . to possess with intent to distribute and to distribute controlled substances." Sup. Indict. at 2–3, ECF No. 183. Specifically, the Government contends that the Defendants possessed and distributed cocaine and heroin. *Id.* at 3. In total, the Government has charged thirty specific counts, all related to the possession or distribution of controlled substances. Of the eighteen Defendants, thirteen have pleaded guilty. Charges are currently pending against the remaining five Defendants.

Currently, trial is set for September 26, 2017, at 8:30 a.m. On July 26, 2017, Defendant Beavers filed a motion to suppress the evidence obtained via use of a Title III wiretap. ECF No. 303. Defendants McRenyolds and Simon have also filed motions to sever. ECF Nos. 305, 311.

On September 11, 2017, the Court held a hearing on these three motions. For the reasons stated on the record and in this order, the three motions will be denied.

**I.**

In the spring of 2015, law enforcement identified a group of individuals acting as major suppliers of heroin and cocaine in Saginaw, Michigan. Investigators utilized a wide variety of investigative techniques, including confidential informants, controlled buys, undercover officers, physical surveillance, and GPS surveillance. On June 1, 2016, investigators received approval to operate a pen register and trap and trace device on Defendant Damarlin Beavers's cell phone for a period of sixty days. At this point, investigators had also been utilizing a pole camera to record a suspected stash house for approximately a year. Despite these efforts, the investigators determined that a court order authorizing interception of communications on certain target cell phones was necessary to uncover the full scope of the criminal conspiracy.

On June 14, 2016, the investigators submitted an application for a Title III wiretap of Defendant Damarlin Beavers's cellphone on June 14, 2016. An affidavit prepared by Special Agent King accompanied the application. The Title III wiretap was authorized the same day for a period of thirty days. The wiretap revealed that Defendant Derek Riley supplied drugs to the conspiracy. On July 21, 2016, investigators submitted a second application seeking authorization for a Title III wiretap of Riley's cell phone and to continue interception of Beavers's calls. The second application was also approved for a period of thirty days. On August 19, 2016, investigators submitted a third application requesting authorization to continue interception of Riley's cell phone for another thirty days. That application was also approved. Around the time the third application was approved, investigators also sought warrants to search a number of locations that investigators suspected were connected to the Sunnyside Gang's operations. The

affidavits which accompanied the requests for search warrants were supported by frequent reference to information obtained via the Title II wiretaps. Beavers now argues that the Title III wiretaps (and all evidence later obtained as a result of their use) are inadmissible because the Government failed to establish that use of Title III wiretaps was necessary.

## II.

The three motions identified above will be addressed in turn. For the reasons that follow, they will be denied.

### A.

In his motion to suppress, Beavers argues that the wiretap was unnecessary. "The basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). Title III provides a procedure whereby authorization for a wiretap can be sought. First, the law enforcement investigators must obtain permission from the United States Attorney General (or his designee) to seek approval of a wiretap. 18 U.S.C. § 2516(1). Then, a written application is submitted to "a judge of competent jurisdiction." § 2518(1). The application must include the identity of the officer making the application, "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous," a statement of the time period for the wiretap, and a statement of whether there have been previous applications for wiretaps in the investigation. *Id.* at § 2518(1)(a)–(f).

The judge may authorize the wiretap only if the judge determines that there is probable cause to believe a crime enumerated in § 2516 is being committed, there is probable cause to believe that communications related to that offense will be obtained via the wiretap, and "normal investigative procedures have been tried and have failed to reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* at § 2518(3).

Title III is thus "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 (1974). "Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). As the moving party, Beavers bears that burden "of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998).

Title III wiretaps are not meant "'to be routinely employed as the initial step in criminal investigation.'" *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). But "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." Rather, "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). In other words, the Government is not required to show the impossibility of using other means to obtain information and, further, "'the mere fact that some investigative techniques were

successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance.'" *United States v. Wolcott*, 483 F. App'x 980, 984 (6th Cir. 2012) (quoting *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002)). Importantly, the Sixth Circuit has held that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" *Stewart*, 306 F.3d at 305 (quoting *Landmesser*, 553 F.2d at 20).

An affidavit accompanying a Title III wiretap application is inadequate if it is "a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand." *Rice* 478 F.3d at 710 (quoting *Landmesser*, 533 F.2d at 20). In reviewing the Title III wiretap, the Court should "judge the evidence in the affidavit based 'on the totality of the circumstances and in a reasonable and common sense manner.'" *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988).

**1.**

In this matter, Special Agent King's affidavit adequately explained why the non-wiretap investigative techniques already employed were insufficient to satisfactorily uncover the full scope of the drug trafficking conspiracy being investigated. In the affidavit, King explained that several confidential informants had provided information to investigators. However, investigators encountered numerous difficulties: confidential informants lost their access to the organization (via incarceration or unwillingness to risk exposure), others were able to only provide information about a small part of the conspiracy, and all the informants faced suspicion and reticence from members of the conspiracy.

Investigators also utilized undercover agents. These agents were able to provide reliable and helpful information, but King believed that it would take an exceedingly long time for an

undercover agent to be accepted into the higher ranks of the conspiracy. The difficulty of infiltration, combined with the danger of exposure, rendered undercover agents an ineffective investigative option.

King also addressed the efficacy of physical surveillance. He explained that surveillance is effective at confirming information that investigators obtain from other sources, but that surveillance is ineffective at affirmatively discovering the purpose of meetings or predicting future action. Thus, although surveillance is an effective complementary investigative technique, it does not function well as a primary investigative technique.

In the affidavit, King also explained that investigators were considering the execution of search warrants on known storage locations. However, investigators knew that the Sunnyside Gang had other, unknown, storage locations and were concerned that prematurely executing search warrants would jeopardize efforts to uncover the entire conspiracy. Law enforcement also considered trash searches of the residences of known coconspirators. But, at the time, only some of the residences of coconspirators had been located. Further, investigators were concerned that trash collection efforts would be easily detected because of the close-knit nature of the community where the coconspirators lived.

Other attempted or contemplated investigative techniques were likewise unsatisfactory. Any attempts to subpoena potential witnesses before the grand jury would have prematurely exposed the investigation. Agents used GPS surveillance to track the movements of one conconspirator's phone, but technological limitations prevented the GPS from providing exact location data. Investigators obtained federal tax returns and credit reports, but ultimately concluded that the records were insufficient to prove that the coconspirators were engaged in drug trafficking. Finally, law enforcement used a pen register and a trap and trace device. Those

devices revealed the quantity of phone calls being made and the phone numbers being called, but did not expose the contents of the calls.

In short, law enforcement utilized a wide array of investigative techniques, with varying success. Some of the techniques, like the use of confidential informants and undercover officers, produced valuable information but involved considerable risk to the participants. Other techniques, like physical surveillance and the pen register, provided circumstantial evidence of wrongdoing (or confirmed the veracity of independently obtained information), but were ineffective at affirmatively uncovering the scope of the conspiracy. And still other techniques, like trash searches, search warrants, and grand jury subpoenas, carried an unacceptable risk of prematurely exposing the investigation and consequently dramatically undermining efforts to capture all coconspirators, not just the low-level members.

**2.**

Thus, Special Agent King's affidavit contained a detailed summary of the investigative efforts prior to the application and a reasonable explanation of why those efforts had proved inadequate. In his motion to suppress, Beavers argues that the affidavit failed to show the necessity of the wiretap because of "the investigative progress made through traditional methods." Mot. Suppress at 7. But "'the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance.'" *Wolcott*, 483 F. App'x at 984 (quoting *Stewart*, 306 F.3d at 305). Special Agent King asserted that, despite the limited successes achieved via traditional investigative techniques, none of those techniques promised to reveal the entire conspiracy. And that assertion was reasonable.

Beavers counters by arguing that confidential informants successfully identified some members of the conspiracy, that Beavers was searched at a traffic stop without raising suspicion, and that law enforcement had been able to conduct physical surveillance of the suspects. Beavers also faults the Government for obtaining authorization to use a pen register and trap and trace device on Beavers's phone for sixty days, then seeking wiretap approval a mere fourteen days into that period. At best, these examples demonstrate that investigators had achieved some success via traditional techniques. More is required to show that the wiretap application was improperly granted.

Beavers further argues that King's explanations regarding the inadequacy of traditional methods "are simply vague assertions about typical problems involved with investigating typical drug" trafficking conspiracies. Mot. Suppress at 8, ECF No. 303. He further contends that King's argument that the wiretap was necessary because "confidential sources are limited in their ability to identify all potential conspirators" was a "slippery slope" because there is always the possibility that another, unknown, conspirator exists. *Id.* at 7.

These arguments ignore the fact that drug trafficking conspiracies are often sophisticated organizations wherein the participants rely heavily upon cell phone communication to coordinate logistics while avoiding detection by law enforcement. The Sixth Circuit has observed that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation,'" and this investigation involved one such criminal enterprise. *Stewart*, 306 F.3d at 305 (quoting *Landmesser*, 553 F.2d at 20).

Upon review of King's affidavit, it is inarguable that the Title III wiretap was not sought as "the initial step" in this investigation. *Giordano*, 416 U.S. at 515. Rather, investigators attempted a number of techniques and considered and rejected even more. King's affidavit

explained, in detail, why a Title III wiretap was advantageous in this situation. It is theoretically possible that investigators could have relied solely upon traditional investigative techniques. But it is manifestly clear that doing so would have necessitated a longer investigation. More importantly, traditional methods would have invariably involved confidential informants or undercover agents, with the accompanying danger, and would have risked premature exposure of the investigation. Beavers argues that because traditional methods had resulted in some success, the Government should have limited itself to those methods. But Title III does not so strictly constrain the Government. Rather, Title III permits courts to authorize wiretaps where traditional methods have been attempted and proven incapable of uncovering the full scope of the criminal activity. In this instance, the scale and sophistication of the criminal conspiracy justified the use of a wiretap. The motion to suppress will be denied.

**B.**

Defendants McReynolds and Simon have both filed motions seeking to sever their trials from that of the remaining Defendants. ECF Nos. 305, 311. Defendant Pratt, Jr., has joined in both motions. All Defendants in this prosecution were originally joined pursuant to Federal Rule of Criminal Procedure 8(b), which permits joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." "For the sake of promoting efficiency and avoiding the potential for inconsistent verdicts, joint trials of defendants who are indicted together are actually encouraged rather than discouraged." *United States v. Cope*, 312 F.3d 757, 779 (6th Cir. 2002). The public interest in joinder trials is especially strong "when two defendants are accused of participating in a conspiracy or joint scheme." *Id.* at 780.

Pursuant to Federal Rule of Criminal Procedure 14(a), "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." However, "[s]everance is required 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "Mutually antagonistic defenses are not prejudicial per se," especially because limiting instructions by the district court can often cure any prejudice. *Zafiro*, 506 U.S. at 538–39.

**1.**

McReynolds argues that joinder is prejudicial as to him because the "evidence against Mr. McReynolds is insignificant in comparison to that of his co-defendants." McReynolds Mot. Sever at 6, ECF No. 305. Accordingly, McReynolds contends that joinder here carries significant risk of "guilt by association." To support that argument, McReynolds notes that the "Government alleges that Mr. McReynolds is an active participant in the conspiracy and the Sunnyside Gang. However, the only evidence to support that claim is approximately 52 calls between Mr. McReynolds and Beavers over a 60 day period." *Id.* at 3.[1] McReynolds also contends that, contrary to the Government's assertion, only about half the calls in question were from McReynolds to Beavers.

---

[1] At the hearing, the Government asserted that McReynolds and Beavers actually exchanged more than 52 calls over this time period. According to the Government, the 52 calls identified by McReynolds are those which contain "pertinent" information which the Government contends is evidence that McReynolds was a participant in the conspiracy.

Properly understood, however, McReynolds's argument is essentially that the Government's evidence that he participated in the alleged conspiracy is weak. That argument falls short of demonstrating that McReynolds will suffer prejudice if he is tried jointly with his co-Defendants. To the contrary, the purpose of the trial is for a jury to determine whether or not a conspiracy existed, and, if so, whether McReynolds participated in that conspiracy. At trial, McReynolds will be free to point to the sparse evidence that he participated in the conspiracy. But there is no reason to believe that the jury will be unable to parse between the evidence that McReynolds participated in the conspiracy personally and the evidence that other co-Defendants participated in the conspiracy. Indeed, the Sixth Circuit has addressed this very issue:

> [A] defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him. As we noted in *United States v. Warner,* 690 F.2d 545, 553 (6th Cir.1982):
>
>> We recognize that, in a joint trial, there is always a danger that the jury will convict on the basis of the cumulative evidence rather than on the basis of the evidence relating to each defendant. However, we adhere to the view, as previously stated by our court, that "[t]he jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately."
>
> *Id.* (citations omitted). The presentation of evidence applicable to more than one defendant is simply a fact of life in multiple defendant cases.

*United States v. Causey*, 834 F.2d 1277, 1287–88 (6th Cir. 1987).

Because McReynolds has not established that a joint trial will prejudice him, his motion for severance will be denied.

### 2.

For similar reasons, Simon's motion for severance will be denied. Simon admits that "this Honorable Court has . . . conducted other multiple Defendant trials, and has undoubtedly sought to avoid prejudice to individual defendants in those trials by the use of stipulations as to

certain facts, and agreed redactions from exhibits and testimony. Simon's Mot. Sever at 7, ECF No. 311. Simon further admits that courts routinely use cautioning instructions to protect against prejudice in multiple defendant cases. *Id.* at 5–6. But Simon argues that joinder will prejudice him here for several reasons. First, Simon argues that "[w]hat sets Mr. Simon apart from all of the co-defendants in this case – and the government knows this based on what they will claim is reliable cooperator testimony – is that he, unlike those co-defendants who remain for trial, is *not* a 'member' of the 'Sunnyside Gang' that has, indeed, a reputation for selling large quantities of heroin and cocaine in Saginaw." *Id.* at 3. Simon continues:

> since the government, in its efforts to prove their case against him, is expected to make use of numerous statements and admissions made by members of a 'gang' of which *he* is not a member, he will be extraordinarily prejudiced by a complete inability to cross-examine them, i.e., either in regard to the statements, themselves, or with regard to the inferences the Government will seek to have the jury draw from the statements.

*Id.* at 8.

Neither argument demonstrates prejudice sufficient to justify severance. Simon's assertion that he is not a member of the Sunnyside Gang is not relevant. The Government has charged Simon merely with participating in a conspiracy with his co-Defendants. The Government is not required to prove that Simon was a member of the Sunnyside Gang. Simon appears to conflate the charged conspiracy and the Sunnyside Gang, but those things are not necessarily synonymous. Like with McReynolds, the purpose of the trial is, in large part, to determine whether a conspiracy existed and if Simon participated in that conspiracy. His assertion that he was not a member of the Sunnyside Gang is an argument for the jury, not an indication of prejudice.

Likewise, Simon has not demonstrated why the evidence that will be admitted at trial regarding his co-Defendants will unduly prejudice him. As explained above, "[t]he presentation

of evidence applicable to more than one defendant is simply a fact of life in multiple defendant cases." *Causey*, 834 F.2d at 1288. Simon argues that admission of coconspirator statements against him will violate his Sixth Amendment right to confront witnesses against him (because he will not be able to call his co-Defendants to the stand against their will). But the Supreme Court case which Simon relies upon involved admission of a coconspirator's *confession* which incriminated the non-declarant defendant. The Government explains that no such confession or other incriminating statement will be admitted against Simon. Gov. Resp. Br. at 4, ECF No. 361. Thus, Simon is simply arguing that, if statements made by co-Defendants regarding the conspiracy are admitted at trial, he will be unduly prejudiced.

It is well settled that "[c]o-conspirator statements in furtherance of a conspiracy are both inherently trustworthy and 'firmly rooted.' '[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E).'" *United States v. Mooneyham*, 473 F.3d 280, 287 (6th Cir. 2007) (quoting *Bourjaily v. United States*, 483 U.S. 171, 183–84 (1987)). As such, "the admission of coconspirator statements does not [unduly] prejudice [Simon] and is not a basis for severance." *United States v. Flannery*, No. 3:09-CR-92, 2010 WL 3283024, at *3 (E.D. Tenn. Aug. 18, 2010). Simon's motion for severance will be denied.

### III.

Accordingly, it is **ORDERED** that Defendant Beavers's motion to suppress, ECF No. 303, is **DENIED.**

It is further **ORDERED** that Defendant McReynolds's and Simon's motions for

severance, ECF Nos. 305, 311, are **DENIED.**

Dated: September 11, 2017  s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 11, 2017.

s/Kelly Winslow
KELLY WINSLOW, Case Manager